Not For Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                    )
IN RE:                              )    CASE NO.        07-32050 (LMW)
                                    )
  PHILIP BOHANNAN,                 )    CHAPTER         7
                                    )
        DEBTOR.                   )    DOC. I.D. NOS.  31, 35
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**APPEARANCES**

| | |
|---|---|
| Barbara H. Katz, Esq. | Movant Chapter 7 Trustee and Special Counsel |
| 57 Trumbull Street | for the Estate |
| New Haven, CT  06510 | |
| | |
| Ronald J. Piombino, Esq. | Counsel for Philip Bohannan, Debtor and Objector |
| Burdick & Piombino | |
| 63 Wall Street | |
| Madison, CT  06443 | |
| | |
| Steven C. Rickman, Esq. | Counsel for Sarah and Frederic Richards, Proposed |
| 59 Elm Street | Purchasers |
| New Haven, CT  06510 | |

**MEMORANDUM OF PARTIAL DECISION**

Lorraine Murphy Weil, United States Bankruptcy Judge

      Before the court are the following (collectively, the "Contested Matter"): the Chapter 7 Trustee's (the "Trustee") Motion To Sell Property Subject to Liens (Doc. I.D. No. 31, the "Sale Motion")[1]; and (b) the above-referenced debtor's (the "Debtor") objection to the Sale Motion (Doc.

---

    [1]    Citations herein to the docket of this chapter 7 case appear in the following form: "Doc. I.D. No. ___."

I.D. No. 35, the "Sale Objection"). The court has jurisdiction over the Contested Matter as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[2]

## I.    BACKGROUND

The Debtor commenced this chapter 7 case by a petition filed on September 7, 2007. Simultaneously with his petition, the Debtor filed a partial set of sworn schedules. (*See* Doc. I.D. No. 1.) The Debtor filed the remaining sworn schedules and a Statement of Financial Affairs on September 24, 2007. (*See* Doc. I.D. No. 17, collectively with Doc. I.D. No. 1, the "Schedules.") Among other things, the Schedules aver the following: as of the filing of the petition (a) real property assets (*i.e.*, the Debtor's home in Westbrook, Connecticut) in the aggregate stated value of $340,000.00; (b) personal property assets in the aggregate stated value of $357,922.00, including $312,500.00 with respect to a 25% interest (the "Interest") in Mulberry Holdings, LLC ("Mulberry");[3] (c) a claim (secured by the Westbrook real property) in the stated amount of $261,676.91; (d) no priority unsecured claims; and (e) general unsecured claims in the aggregate stated amount of $154,215.92. The Debtor does not claim the Interest as exempt on his Schedule C.

The last day for filing proofs of claim in this case was May 15, 2008. The claims register in this case discloses that six proofs of (unsecured) claim were timely filed in this case in the aggregate stated amount of $122,385.02. That amount includes Claim No. 1 filed by Mulberry in the stated amount of $58,694.83 allegedly due from the Debtor as rent for the berthing of one or

---

[2] That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceeding arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

[3] Not included in the schedule of personal property is a personal injury claim which the Debtor may have against his former wife. (*See* Doc. I.D. No. 63.)

more boats at the Marina (as defined below). (*See* Claim No. 1, the "Mulberry POC.")  To date, the Trustee has not objected to the Mulberry POC.

## II.  SALE PROCEEDINGS

On February 19, 2008, the Trustee filed and served a notice of her intent to sell the Interest for $60,000.00 cash pursuant to a private sale to Frederic and Sarah Richards (the "Proposed Purchasers"). (*See* Doc. I.D. No. 30.)  On the same date the Trustee filed the Sale Motion which seeks this court's approval of the proposed transaction.  The Debtor filed the Sale Objection on February 27, 2008.  As explained below, in partial response to the Sale Objection the Proposed Purchasers increased their offer to $80,000.00.

An evidentiary hearing (the "Hearing") on the Contested Matter was conducted over two days (*i.e.,* July 15, 2008 and September 2, 2008).[4]  At the Hearing, the Trustee produced the testimony of the following witnesses:  Amy Johnston (manager of the Marina); Mark Nadeau (a certified appraiser); Adam Hoffman (a licensed land surveyor); and Frederic M. Richards (one of the Proposed Purchasers and president of Mulberry).  The Debtor produced the testimony of the following witnesses: Professor Peter Sakalowsky (a certified real estate appraiser); and the Debtor.[5]  Both the Trustee and the Debtor introduced documentary evidence into the record at the Hearing.[6]

---

[4]   A transcript of the July 15, 2008 proceedings appears in the record as Doc. I.D. No. 59 and references herein to that transcript appear in the following form: "7/15/08 Transcript at ___." A transcript of the September 2, 2008 proceedings appears in the record as Doc. I.D. No. 62 and references herein to that transcript appear in the following form: "9/2/08 Transcript at ___."

[5]   By agreement, Mr. Nadeau, Mr. Hoffman and Professor Sakalowsky all testified as expert witnesses.

[6]   References to the Trustee's exhibits appear herein in the following form: "Trustee Exh. __." References herein to the Debtor's exhibits appear in the following form: "Debtor Exh. __."

**III.    FACTS**

Mulberry was formed in or about April, 1995 as a Connecticut limited liability company. (*See* Trustee Ex. E.) Mulberry is governed by an Operating Agreement dated April 7, 1995. A copy of that agreement (the "Agreement") is in the record as Trustee Exh. E. Article XI (the "Transfer Restrictions") of the Agreement provides in relevant part as set forth in Schedule A annexed hereto. The Proposed Purchasers own 65.5%[7] of Mulberry. (*See* 7/15/08 Transcript at 121 (testimony of Mr. Richards).) The Proposed Purchasers would not consent (as required by Agreement § 11.02(f)) to the sale of the Interest to a third party. (*See id.* at 122 (testimony of Mr. Richards). *Cf.* note 13, *infra*.) The Proposed Purchasers and the Debtor have been negotiating for about two and one half years with respect to a purchase of the Interest. (*See* 9/2/08 Transcript at 60 (testimony of the Debtor).)

Mulberry's business is located on a portion of 311 Chaffinch Island Road in Guilford, Connecticut (the "Property"). (*See* Trustee Exh. C.) Mulberry bought the Property in April, 1995 for $400,000.00. The Debtor testified that the 1995 acquisition price was based on the Property's potential use as a private home site. (*See* 9/2/2008 Transcript at 75 (testimony of the Debtor).) Mr. Nadeau testified as to his opinion that the 1995 acquisition price was inflated. (*See* 7/15/08 Transcript at 84 (testimony of Mr. Nadeau); *see also* Trustee Exh. C at 7 ("The sales price appears to be somewhat high relative to current income in place and a comparison of comparative sales.").)

The Property "is comprised of an irregular shaped site that enjoys frontage along Chaffinch Island Road as well as . . . frontage along the western bank of the West River." (*See* Trustee Exh. C at 1.) A substantial amount of the acreage is attributable to wetlands (including tidal wetlands).

---

[7]    Based on the 2007 Income Tax Return of Mulberry (*see* Trustee Exh. I), that figure may actually be 62.5%. In any event, the Proposed Purchasers own a majority interest in Mulberry.

(*See id.; see also* 7/15/08 Transcript at 48, 63 (testimony of Mr. Nadeau).)  There is a large marsh all the way around the Property.  (*Id.* at 7 (testimony of Ms. Johnston).)  The Property has relatively quick access by boat to Long Island Sound.  (*See* 9/2/08 Transcript at 48 (testimony of Professor Sakalowsky).)  The West River has a deep, dredged channel which accommodates deeper craft.  (*See id.* at 41 (testimony of Professor Sakalowsky).)

There is a single frame 2,072 square foot building on the Property that contains a shop area, meeting room and an apartment (the "Apartment") together with a gravel parking area and a crushed shell driveway.  Also on site are 29 or 30 boat slips.  (*See* Trustee Exh. C at 25 ("Subject Improvements Description"); *see also* 7/15/08 Transcript at 13-15 (testimony of Ms. Johnston).)  Mulberry's business is operated as the "Bayberry Creek Marina" (the "Marina") and "caters primarily to commercial fishermen."  (*See* Trustee Exh. C at 25.)  About half the slips are leased out to the adjacent Brown's Boatyard.  (*See* 7/15/08 Transcript at 14-15 (testimony of Ms. Johnston).)  The remaining slips are leased out by Mulberry directly to commercial fishermen.  (*See id.*)  The Apartment is newly leased.  (*See* Trustee Exh. O.)

The Marina parking lot has ankle deep flooding on a monthly basis on a "full moon high tide."  (*See* 7/15/08 Transcript at 11, 38 (testimony of Ms. Johnston).)  More significant flooding occurs on roughly an annual basis when a "Nor'easter" occurs.  (*See id.*)  The Property is in a flood zone.  (*Id.* at 50-52, 76-78 (testimony of Mr. Nadeau).)  The only potable water currently available to the Property is trucked in on a monthly basis.  (*See id.* at 26-27 (testimony of Ms. Johnston).)  An attempt was made in the 1970's to drill a well for the Property, but the water was not potable and no attempt was made to redrill.  (*See id.* at 41-42 (testimony of Ms. Johnston).)   The existing building has a septic system but Mr. Nadeau and Mr. Hoffman doubt that additional septic facilities

necessary for residential development would receive regulatory approval. (*See id.* at 73-74 (testimony of Mr. Nadeau); *id.* at 109 (testimony of Mr. Hoffman).)

Mr. Nadeau gave his opinion that the Property was worth $575,000.00 as of July 14, 2008 based on the current use of the Property as its "highest and best use," and using a combination of the comparable sales and capitalization of income methods of valuation. (*See id.* at 45-59 (testimony of Mr. Nadeau); *see also* Trustee Exh. C (Nadeau appraisal report as of February 1, 2007); Trustee Exh. O (Nadeau appraisal report updated to July 14, 2008).) The (updated) Nadeau appraisal took into account the "sharply declining situation in the residential climate," (7/15/08 Transcript at 88:23-24 (testimony of Mr. Nadeau)). Mr. Nadeau also gave his opinion that development of the Property for residential use is not feasible. (*Id.* at 52-53, 70-71 (testimony of Mr. Nadeau).) Mr. Hoffman testified to like effect. (*See id.* at 101-103 (testimony of Mr. Hoffman).)

Professor Sakalowsky gave his opinion that, as of April 17, 2007, the Property had a market value of $1,250,000.00 using a highest and best use as a vacant building lot for a three or four bedroom house with boat slips. (*See* 9/2/2008 Transcript at 9-16 (testimony of Prof. Sakalowsky); *see also* Debtor Exh. 2 (Sakalowsky appraisal report).) Professor Sakalowsky's opinion assumes that there is adequate potable water for the Property and adequate septic facilities and also proceeds on the belief that all necessary regulatory approvals can be obtained on some reasonable time line. (*See* 9/2/2008 Transcript at 12, 26-29 (testimony of Professor Sakalowsky).) Professor Sakalowsky's opinion of value was not updated from April 17, 2007 and did not take current residential market conditions into account. (*See* 9/2/08 Transcript at 9-16 (testimony of Professor Sakalowsky).)

Around the time Mulberry acquired the Property in 1995, Mulberry and the Debtor entered into a lease to berth one or more boats at Property boat slips. (*See* Trustee Exh. M.) The Debtor

denies that he berthed any boats owned by him personally at the Property after around 1997. (*See* 9/2/08 Transcript at 62-64 (testimony of the Debtor).)  Rather, the Debtor claims that subsequently "we rewrote - - redid the agreement with Mulberry" to cover only boats owned by a limited liability company in which the Debtor had an interest.  (*See id.* at 62:23-24 (testimony of the Debtor).)

## IV.    THE DISPUTES

At the Hearing, the Trustee introduced Trustee Exh. H into the record.  Included in that exhibit is a copy of a December 17, 2007 letter to the Trustee stating and explaining a prior version of the offer of the Proposed Purchasers to purchase the Interest.  Annexed to that letter is a document entitled "Mulberry Holdings, LLC Valuation."  (*See* Trustee Exh. H.)  The substance of that attachment is set forth in Schedule B annexed hereto.  The court does not include Schedule B because the court necessarily accepts that valuation methodology as correct but, rather, because Schedule B serves to frame the issues in a helpful way.

The Sale Objection states in relevant part:

> The Trustee's basis for arguing that the proposed sales price is reasonable is based primarily upon the appraised value of the . . . [Property] and that Mulberry . . . owes unpaid dividends to Class B members . . . .[8]
>
> The [P]roposed [P]urchasers . . . provided an appraisal based upon the current use as a marina . . . .  The Debtor submits the more accurate appraisal is the Debtor's appraisal based upon the highest and best use of the [P]roperty [as land developable as a single three or four bedroom residential site].

(Doc. I.D. No. 35 at 1.)

---

[8]     At the beginning of the Hearing, the Proposed Purchasers and the Trustee conceded that there were no "Class B" shares and thus no "Class B" dividends owing.  The Proposed Purchasers' offer was increased to $80,000.00 (cash) as a consequence.  Accordingly, the "Class B" dividend issue is moot.

At the Hearing, the Debtor raised three additional objections not raised in the Sale Objection: (1) that the value ("Property Value") of the Property must be determined pursuant to arbitration in accordance with Section 11.04 of the Agreement (the "Arbitration Issue"); (2) the Setoff (as that term is defined in Schedule B)[9] is inappropriate; and (3) the propriety and amount of the Discount (as that term is defined in Schedule B) is unsupported by the record. This opinion resolves only two of those issues: the Property Value issue (*i.e.,* the "highest and best use" of the Property) and the Arbitration Issue. The remaining issues are reserved for future proceedings.

## V. ANALYSIS

### A. Standard for Approval of Proposed Sale

A court's evaluation of a trustee's recommendation of a sale is subject to the "business judgment" test. *In re Bakalis,* 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998). This court adopts the following statement from *Bakalis*:

> Although a trustee's business judgment enjoys "great judicial deference," [Matter of] *WPRV-TV, Inc.*, 143 B.R. [315,] 319 [(D.P.R. 1991), *vacated on other grounds,* 165 B.R. 1 (D.P.R. 1992), *aff'd in part, rev'd in part,* 983 F.2d 336 (1st Cir. 1993)], this discretion is not without limit. A duty is imposed upon the trustee to maximize the value obtained from a sale, particularly in liquidation cases. *See, e.g., In re S.N.A Nut Co.,* 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992) ("[T]he trustee has a duty to realize the maximum return for the estate for further distribution to the Debtor's creditors.") . . . .
>
> To ensure compliance with those duties, a bankruptcy court is generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales. *See* [*Matter of*] *Chung King[, Inc.],* 753 F.2d [547] . . . 549 [(7th Cir. 1985)[10]]

---

[9] The word "Setoff" is used here in the general sense and not in the technical, legal sense.

[10] *Chung King* draws the distinction between initial sale approval (where there is a wide range of court discretion) and a motion to vacate a previously approved sale (where there is a narrow

> Furthermore, in appropriate circumstances it is proper for a court to interfere with the trustee's judgment "for the purpose of safeguarding the interest of parties concerned . . . ."

*Bakalis*, 220 B.R. at 532 (citations omitted).

Moreover, there are conditions for the invocation of the "business judgment rule." The "business judgment rule" is a concept broadly applicable to fiduciary situations. It is "a presumption that in making a business decision the . . . [fiduciary] acted on an informed basis [] and in the honest belief that the action taken was in the best interests of . . . [the fiduciary's beneficiaries]." *In re The Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006) (internal quotation marks omitted). When the fiduciary's "methodologies and procedures are restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted . . . , then inquiry into . . . [the fiduciary's acts] is not shielded by the business judgment rule." *Resolution Trust Co. v. Rahn,* 854 F.Supp. 480, 489 (W.D. Mich. 1994). Moreover, "[t]rustees, like executors and administrators, must use reasonable diligence in the discharge of their duty to 'collect and reduce to money the property of the estates for which they are trustees'." 6 Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy* ¶ 704.04[1], at 704-14 (15th ed. rev. 2005). *Cf.* 11 U.S.C. § 704(a)(1).

### B. Standard for Highest and Best Use

> "Highest and best use" is a term of art in the lexicon of real estate appraisal which means the most reasonable and probable use of vacant land or improved property that supports the highest present value as of the date of the appraisal . . . . [T]here are four criteria that must be met in order to appraise the property at its "highest and best use": (1) legal permissibility of the proposed use (zoning requirements and legally permitted uses); (2) physical possibility for the proposed use; (3) financial feasibility of the project[;] and (4) whether the proposed use of the property will result in maximization of the profits derived therefrom.

---

range of court discretion).

*Mocco v. City of New Jersey (In re Mocco),* 222 B.R. 440, 452 n.9 (Bankr. D.N.J. 1998). "The highest and best use of the property can be based upon reasonable future probability; however, speculative and remote possibilities cannot become a guide for the ascertainment of value . . . ." *United States v. L.E. Cooke Co. Inc.,* 991 F.2d 336, 341 (6th Cir. 1993) (citation and internal quotation marks omitted). "The question of the highest and best use of a property is a question of fact. If the evidence as to whether the property is adaptable for a certain use is in conflict, it is [the province of the trier of fact] . . . to determine which highest and best use and resulting valuation are more credible." 27 Am. Jur. 2d *Eminent Domain* § 548 (2008) (footnotes omitted).

### C.     **Property Valuation**

Both the Trustee and the Debtor agree that it is for this court to determine the value of the Interest. Typically, when there is a dispute as to the value of property, the court will require that the property be exposed to the market by public sale or other marketing efforts. However, in this case neither party has suggested that procedure. Given the foregoing and the nature of the property involved (*i.e.,* a minority equity interest in a closely held limited liability company subject to the Transfer Restrictions), the court declines to introduce the concept of exposure to the market into these proceedings and will deal with the issues as the parties have framed them.

Both parties concede that the value of the Interest is driven primarily by the Property Value which, in turn, is primarily a function of "highest and best use" of the Property. The court has considered the evidence on both sides of the "highest and best use" issue. The court finds the Trustee's evidence to be more persuasive than the Debtor's evidence with respect to that issue for reasons including (but not limited to) (a) that Professor Sakalowsky's appraisal assumed timely receipt of necessary regulatory approvals (an assumption the court does not share based on the record) and (b) that Mr. Nadeau's appraisal was updated to the day before the Hearing and took into

account rapidly deteriorating residential market conditions while Professor Sakalowsky's appraisal was about fourteen months old as of the commencement of the Hearing and did not take current (deteriorating) market conditions into account. Accordingly, the court finds that the Property value as of the Hearing was $575,000.00.

### D. Arbitration Issue

The Trustee complained at the Hearing that the Debtor did not mention the Arbitration Issue in the Sale Objection and should not be allowed to rely upon it at the Hearing. (*See* 9/2/08 Transcript at 79-80 (argument of the Trustee).) The court concurs. Moreover, the court agrees with the Trustee that Section 11.04 of the Agreement does not apply to this situation in any event. Section 11.04 does not apply here because the Trustee stands in the Debtor's shoes with respect to the proposed sale and the Trustee and the Proposed Purchasers are in agreement as to Property Value and the Interest. Moreover, Section 11.04 applies only if Sections 11.02 or 11.03 apply. Section 11.02 applies only if there is a third-party offer "on the table," and Section 11.03 does not apply on its face.

### E. Remaining Issues

The Debtor argues that there is no competent support in the record for the Discount (either as to propriety or amount (if any).) (*See* 9/02/08 Transcript at 86-87 (argument by Attorney Piombino).) The court agrees. Moreover, there are unresolved issues with respect to the Setoff.[11]

---

[11] Is the Setoff the obligation of the Debtor or of a separate entity? What is the effect of the Mulberry POC? Should the Debtor be permitted to object to and litigate the Mulberry POC? Should the amount of the Setoff (if otherwise appropriate) be adjusted downward to reflect the distribution (if any) that Mulberry will receive on the Mulberry POC in this case? Should any appropriate Setoff amount be applied before or after the Discount (assuming that the Discount otherwise is appropriate)?

Accordingly, the court will order a status conference to consider "next steps" with respect to the remaining issues.

## VI. **CONCLUSION**

The court concludes that the Debtor's argument with respect to the Arbitration Clause could not be raised at the Hearing for failure to be raised in the Sale Objection, and that such argument otherwise is unpersuasive and/or inapposite. The court finds the value of the Property as of the date of Hearing to be $575,000.00 and the value of the Interest to be $126,439.25 (prior to downward adjustments (if any) for the Setoff and the Discount).[12] By separate order, the court will schedule a status conference in the Contested Matter to consider "next steps" with respect to the remaining issues.

It is **SO ORDERED.**

Dated: January 6, 2009                                         BY THE COURT

*Lorraine Murphy Weil*
**Lorraine Murphy Weil**
**United States Bankruptcy Judge**

---

[12]   $\frac{\$575,000 - \$69,243}{4} = \$126,439.25$ (*cf.* Schedule B)

<u>SCHEDULE A</u>

Section 11.01.  <u>Transfer of All or Any Interest in Membership Units.</u>  A Member may not transfer, sell or otherwise assign his, her or its Membership Units or any interest in such Units, except as permitted by this Agreement.

Section 11.02.  <u>Lifetime Transfer of Membership Unit.</u>

(a)  In the event a Member desires to sell, assign or otherwise transfer any portion or all of his, her or its Membership Unit(s) and has not received prior written consent of the other Members, that Member may sell, assign or otherwise transfer such Unit(s) only after first offering the Unit(s) to the Company, and then to the other Members in the manner described in this Section 11.02.

(b)  The Member desiring to sell, assign or otherwise transfer all or part of his Unit(s) shall deliver a written notice to the Company and the other Members specifying the Unit(s) and the price and other terms of the proposed sale, assignment or transfer.  Such notice shall constitute an offer to sell the Unit(s) described in the notice to the Company and other Members on the same terms and conditions at a price equal to the lesser of (x) the price set forth in the proposed transfer of sale offer, or (y) the price determined under the provisions of Section 11.02(d) below.

(c)  For a period of fifteen (15) days following receipt of the notice and offer described in Section 11.02(b) above, the Company shall have the option to purchase all of the Unit(s) so offered at the purchase price also described in that Section.  In the event the option shall be exercised by the Company within that period, the Secretary of the Company shall give written notice of such exercise to the transferring Member, and other Members and the Company shall purchase in full the offered Units.

(d)  If the Company fails to exercise its option described in Section 11.02(b), the remaining Members, or Members in proportion to their Unit interests, as the case may then be, shall have the option to purchase that portion of the offered Unit(s) upon the same terms and conditions which were available to the Company within the fifteen (15) day period following the lapse of the Company's option to purchase.  This Member option shall be exercised by providing written notice to the Secretary of the Company within the option period of the acceptance of the transferring Member's offer and the portion of the Unit(s) to which such acceptance and exercise pertains, and the tender of full payment therefor within such period to the offering Member.  If this option is available to more than one Member, and all of the transferring Members Unit(s) are not disposed of by the exercise of their proportionate options, the remaining Members shall be entitled to purchase the remaining Unit(s) or part thereof originally offered by the transferring Member, or whatever proportions they may otherwise agree, and this additional Member option shall be on the same terms and conditions as the original Member option and shall be exercisable in the same manner within the fifteen (15) day period following the original Member option described above.

(e)  In the event the Company and the remaining Members fail to exercise their options to redeem or purchase in the aggregate all of the Unit(s) offered, the transferring Member shall be free to withdraw his offer and to transfer not less than all of the Unit(s) so offered within one (1) year from the date his notice of offer was

given, to the person or persons named in the bona fide offer described above, provided, however, that he shall not sell, assign or transfer such shares at a lower price or on terms more favorable to the purchaser or transferee than those specified in his notice of offer. The person or persons acquiring the Unit(s) or portions thereof shall hold them again subject to the terms and conditions contained in this Agreement. If no transfer is made within one (1) year, no transfer shall be made thereafter without again giving the notice and option to the Company and other Members provided in this Section 11.02.

(f) *Notwithstanding any of the foregoing provisions of this Article XI, a Member must have Majority-in-Interest Consent before transferring a Membership Unit. Any transfer made without such Majority-in-Interest Consent is void.*[13]

Section 11.03  Death Redemption.

(a) Within ninety (90) days after the death of a Member who is a natural person, in accordance with the price and payment provision of Sections 11.04 and 11.05 below, the Company shall purchase and redeem, and the estate of the deceased Member, as the case may be, shall as herein described surrender, all Unit(s) owned by such Member at the time of his or her death.

(b) For purposes of this Agreement, the word "death" shall mean actual physical death as evidenced by a certified Certificate of Death or the passage of a two (2) year period of unaccounted-for-absence as a missing person.

Section 11.04  Purchase Price.  The purchase price of a withdrawing or deceased Member's Unit(s) in the Company for purposes of Sections 11.02 and 11.03 above shall be equal to such Member's capital account adjusted in the manner provided in this Section 11.04. Such capital account shall be taken as of the beginning of the Fiscal Year in which withdrawal or death occurred and shall be increased or decreased by such Member's share of Company profits or losses from the beginning of such Year until the last day of the month preceding the date of withdrawal or death and decreased or increased by withdrawals and contributions taken or made during such period. In addition, the capital account shall be increased by the proportionate share of the excess, if any, of the fair market value of all real property owned by the Company on the date of withdrawal or death over its total book value to the Company on that date. The fair market value of the real estate shall be determined by agreement of the withdrawing Member or the executor or administrator of the deceased Member, as the case may be, and the remaining Members. If they do not reach an agreement within fifteen (15) days after the date of withdrawal or the appointment of a legal representative, the value shall be determined by arbitration, as follows. The remaining Members shall collectively name one arbitrator and the withdrawing Member or the executor or administrator of the estate of deceased Member shall name one arbitrator (an arbitrator shall be an M.A.I. real estate appraiser of recognized standing in New Haven County), and the two shall determine the fair market value of all real estate owned by the Company

---

[13] (emphasis added.) The restriction of Section 11.02(f) is enforceable in these Section 363 proceedings. *See In re Integrated Resources, Inc.,* No. 90-B-1041(CB), 1990 WL 325414, *6 (Bankr. S.D.N.Y. Oct. 22, 1990) (state law transfer restrictions applicable to Section 363(b)(1) proceedings).

> as of the date of withdrawal or death. If the two arbitrators cannot agree upon the value of the real estate, they shall appoint a third arbitrator and the decision of the majority shall be binding.

(Trustee Exh. E at 15-17 (emphasis added).)

## SCHEDULE B

**Mulberry Holdings, LLC Valuation**

| | | | |
|---|---|---:|---:|
| **Appraised Income Approach Business Value** | | | **$500,000** |
| **Less Business Liabilities** | | | |
| Liabilities | | | |
| | Current Liabilities | 494 | |
| | Mortgages | 68,024 | |
| | Other Liabilities | 725 | |
| | Total Liabilities | 69,243 | **(69,243)** |
| **Net Fair Market Value of Business Assets** | | | **430,757** |
| **Less Undistributed Class B Dividend Liability of Mulberry Holdings, LLC** | | | |
| Cost of 'B' Shares | | 75,000 | |
| | 1995 at 8% for 9 Months | 4,500 | |
| | 1996 at 8% | 6,000 | |
| | 1997 at 10% | 7,500 | |
| | 1998 at 10% | 7,500 | |
| | 1999 at 10% | 7,500 | |
| | 2000 at 10% | 7,500 | |
| | 2001 at 10% | 7,500 | |
| | 2002 at 10% | 7,500 | |
| | 2003 at 10% | 7,500 | |
| | 2004 at 10% | 7,500 | |
| | 2005 at 10% | 7,500 | |
| | 2006 at 10% | 7,500 | |
| | 2007 at 10% | 7,500 | |
| | Total Dividends | 93,000 | **(93,000)[14]** |
| **Available Marketable Business Value** | | | **337,757** |
| **Bohannan Value** | | | |
| | Business Value | 337,757 | |
| | One Quarter share | 84,439 | |
| | Less 50% Discount[15] | (42,220) | |
| | **Bohannan Net Value** | **42,220** | |
| | Uncollected rent | (58,695) | |
| | Damage to assets | (17,495) | |

| | |
|---|---:|
| **Bohannan Buy Out Without Setoff** | **42,220** |
| **Bohannan Buy Out With Rent and Damage Setoff [the "Setoff"]** | **(33,970)** |

---

[14]   See note 8, *supra.*

[15]   (hereafter, the "Discount")